UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MIGUEL VALADEZ, ET AL.,

          Plaintiffs,

    v.

CSX INTERMODAL TERMINALS, INC.,

          Defendant.

Case No. 15-cv-05433-EDL

**ORDER DENYING DEFENDANT'S MOTION TO STRIKE AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Re: Dkt. Nos. 105, 111

     Plaintiffs Miguel Valadez, Nora Ledesma, Manuel Ledesma, Anthony Green, Jr., and Eleaquin Temblador ("Plaintiffs") moved for partial summary judgment on their employment status in this wage and hour case. Defendant CSX Intermodal Terminals, Inc. ("Defendant") moved to strike or dismiss Plaintiffs' representative Private Attorney General Act of 2003 ("PAGA") claims. For the reasons set forth below, the Court **DENIES** both motions.

# I.    BACKGROUND

     Defendant CSX Intermodal Terminals, Inc. ("CSXIT"), a federally registered motor carrier, provides intermodal transport[1] services to shippers that use railroads to transport freight in and out of California. The portion of the intermodal move that takes place by truck is known as drayage. Defendant's customers request drayage services based on railroads' arrival and departure schedules. Drayage drivers ("Drivers") then drive a truck that is hooked up to a trailer or container (which may or may not contain freight) either (i) from a rail ramp to a location in California, or (ii) from a location in California to a rail ramp for later transport out of state. Dkt. 65-4, Hand Decl. ¶ 8.

     Defendant previously contracted with Drivers, whom it categorized as independent

---

[1] "Intermodal transport" is the combination of at least two different methods of shipment (e.g., rail to truck or rail to ship).

contractors. Defendant did not own its own trucks. Instead, Drivers owned trucks that they leased to Defendant pursuant to Contractor Operating Lease Agreements ("COLAs"). The COLAs provided for compensation per load (i.e., "linehaul"), as well as for other types of payments.[2] Id. ¶ 22. As of September 15, 2016, Defendant ceased using Drivers, and now uses only third-party trucking companies to conduct drayage. Id. ¶ 14. The agent trucking companies operate under their own Department of Transportation authority. Kaufmann Decl. Ex. 1 at 31.

Plaintiffs worked as Drivers. Valadez performed drayage services for Defendant from approximately 2005 to October 2013. Dkt. 65-4, Hand Decl. ¶ 16. Green performed drayage services for Defendant from approximately October 2013 to February 2015. Id. ¶ 20. Nora Ledesma performed drayage services for Defendant from approximately 2003 to March 2014. Id. ¶ 18. Manuel Ledesma performed drayage services from approximately 2003 to March 2014. Id. ¶ 19. Temblador performed drayage services for Defendant from approximately 1994 to September 2016. Id. ¶ 21.

During their relationships with Defendant, each Plaintiff entered into successive COLAs with Defendant. Id. ¶¶ 16, 18-21. Plaintiffs did not negotiate rates with Defendant's customers for delivery or pickup. Plaintiffs never invoiced clients when they were working for Defendant. All Plaintiffs documented their deliveries and pickups on the application on the tablets or forms provided by Defendant. It was each Plaintiff's understanding that he or she needed to "only use the tablet and/or forms provided by" Defendant. Defendant required Plaintiffs to notify **it** in advance if Plaintiffs would not be able to perform drayage services at any time or for any reason. N. Ledesma Decl. ¶¶ 2-5, ¶¶ 7-8; M. Ledesma Decl. ¶¶ 2-5, ¶¶ 7-8; Green Decl. ¶¶ 2-7; Temblador Decl. ¶¶ 2-5, ¶¶ 7-8; Valadez Decl. ¶¶ 2-6. Defendant offered only one assignment at a time; Plaintiffs were not offered multiple assignments at a time with the opportunity to choose which of them to accept**.** N. Ledesma Decl. ¶¶ 2-5, ¶¶ 7-8; M. Ledesma Decl. ¶¶ 2-5, ¶¶ 7-8; Green Decl. ¶¶ 2-7; Temblador Decl. ¶¶ 2-5, ¶¶ 7-8.

Nora Ledesma states that she was notified that Defendant was terminating her COLA in

---

[2] For example, Drivers received extra pay for picking up hazardous material, if loads were overweight, or if they had to wait at the gate. Dkt. 123 Hand Decl. Opp. Pltfs' MPSJ, Ex. 1 at 1.

March 2014 for refusing to accept an assignment. N. Ledesma Decl. ¶ 6. She did not receive any drayage assignments from Defendant after it notified her that her COLA was being terminated. N. Ledesma Decl. ¶ 6. Manuel Ledesma states that he notified Defendant in March 2014 that he would no longer work for it on account of its treatment of Nora Ledesma. M. Ledesma Decl. ¶ 6. Green states that Defendant notified him in February 2015 that it was terminating his COLA because his work was too slow. Green Decl. ¶¶ 8-9. He did not receive any drayage assignments from Defendant after it notified him that his COLA was being terminated. Green Decl. ¶ 9. Valadez states that Defendant notified him in September 2013 that it was terminating his COLA because he refused to obtain a new truck. Valadez Decl. ¶¶ 8-9. He did not receive any drayage assignments from Defendant after it notified him that his COLA was being terminated. Valadez Decl. ¶ 9. Temblador asserts that Defendant notified her in August 2016 that it was terminating her COLA due to a change in its business model and that it was terminating the contracts of all other California Drivers at approximately the same time. Temblador Decl. ¶ 6.

On September 24, 2011, Nora Ledesma entered a COLA with Defendant.[3] N. Ledesma Decl. Ex. 1 at 1. The term of the COLA was 30 days, but the COLA provided that it would automatically renew for successive 30 day periods unless otherwise terminated. N. Ledesma Decl. Ex. 1 ¶ 1. The COLA stated that the parties were forming an independent contractor relationship and not an employer-employee relationship. N. Ledesma Decl. Ex. 1 ¶ 2. Accordingly, as the contractor, Nora Ledesma was responsible for all taxes she owed. N. Ledesma Decl. Ex. 1 ¶ 2. The COLA provided that the parties' relationship would be in accordance with federal, state, and local regulations. N. Ledesma Decl. Ex. 1 ¶ 3.

The COLA provided Nora Ledesma with the "sole discretion" to accept any shipments from Defendant that Defendant made available to her but that she was required to perform any work she accepted "in accordance with the terms" of the COLA "and in a manner that reasonably ensures continued satisfaction" of Defendant's customers. N. Ledesma Decl. Ex. 1 ¶ 4. Nora Ledesma was also required to provide "all transportation, loading and unloading, and other

---

[3] The Court summarizes the terms of the most recent COLA each Plaintiff signed.

1    services" necessary in connection with the shipment.  N. Ledesma Decl. Ex. 1 ¶ 4.

2         The COLA required Nora Ledesma to furnish, at her discretion, all drivers and personnel

3    required to operate any vehicle she used.  N. Ledesma Decl. Ex. 1 ¶ 5A.  Defendant retained the

4    right to "disqualify any driver provided by" her 'in the event that the driver is found to be unsafe,

5    unqualified, unfit, uninsurable, or marginal, pursuant to federal or state law or the criteria

6    established by the [Department of Transportation's] CSA DIRS, in violation of [Defendant's]

7    minimum qualification standards, or in violation of any policies of [Defendant's] customers."  N.

8    Ledesma Decl. Ex. 1 ¶ 5C.  The COLA specified that drivers "with a recent history of accidents,

9    traffic convictions and/or serious traffic offenses" would not meet its minimum qualification

10   standards.  N. Ledesma Decl. Ex. 1 ¶ 5C.

11        The COLA required Nora Ledesma to provide a vehicle with a "computer/satellite

12   communicating device that is compatible with the system utilized by" Defendant.[4]  N. Ledesma

13   Decl. Ex. 1 ¶ 5D.  She had the option of providing her own compatible device or using one

14   provided by Defendant, for which she would have to reimburse Defendant, at a cost of $395.00, if

15   she lost or damaged it or did not return it after termination of the COLA.  N. Ledesma Decl. Ex. 1

16   ¶ 5D.  She was also required to carry an approved and working wireless communication device

17   and provide Defendant with the phone number.  N. Ledesma Decl. Ex. 1 ¶ 6B.  She was further

18   required to abide by Defendant's safety rules, as documented in Defendant's "Carrier Safety

19   Rules," which Defendant reserved the right to update.  N. Ledesma Decl. Ex. 1 ¶ 6B. Pursuant to

20   various laws, the COLA provided that she would have her vehicle inspected as often as federal,

21   state, and local laws required, that she would submit her vehicle to safety inspections by

22   Defendant, and that she would not have any passengers in her vehicle without prior permission

23   from Defendant.  N. Ledesma Decl. Ex. 1 ¶¶ 6C, 6D, 6F.

24        In the event of an accident, the COLA required Nora Ledesma to immediately notify

25   appropriate public safety agencies, immediately notify Defendant, and submit a written accident

26

27   [4] According to Defendant's 30(b)(6) Designee Paul Hand's deposition testimony from October 5,
     2017, this kind of electronic logging device "will be required" in 2017 or 2018, but Defendants
28   decided "to get out in front of this back" in 2011 and 2012. Kaufmann Decl. Ex. 1 at p. 15.  It
     measures the hours that the truck it is  plugged into is turned on.  Id.

report to Defendant as soon as possible after the occurrence. N. Ledesma Decl. Ex. 1 ¶ 6G. She also had to "cooperate fully with [Defendant] with respect to any legal action, regulatory hearing or other similar proceeding arising from the operation of the Vehicle, the relationship created by [the COLA], or the Services performed thereunder." N. Ledesma Decl. Ex. 1 ¶ 6G. In addition, upon Defendant's request, she had to provide Defendant with "written reports or affidavits, attend hearings and trials and assist in securing evidence or obtaining the attendance of witnesses." N. Ledesma Decl. Ex. 1 ¶ 6G.

Under the COLA, she was responsible for her operating costs, including but not limited to "fuel, oil, tires and all equipment and accessories and devises used in connection with the operation of the Vehicle," purchasing the vehicle, all mobile communications equipment and service costs, all insurance deductibles, costs that exceed insurance coverage, and costs that are not covered by insurance. N. Ledesma Decl. Ex. 1 ¶ 6I. Defendant would provide all the necessary permits. N. Ledesma Decl. Ex. 1 ¶ 9A. Defendant would also provide placards to affix to the vehicle. N. Ledesma Decl. Ex. 1 ¶ 9B.

The COLA provided that Defendant would pay Nora Ledesma according to a Rate Schedule which was attached to the COLA, and which could be modified from time to time by written agreement of the parties. N. Ledesma Decl. Ex. 1 ¶ 7A. It further provided that Defendant would pay her within 15 days after she submitted, in proper form, all the documents necessary for Defendant to secure payment from the shipper. N. Ledesma Decl. Ex. 1 ¶ 7B. Defendant was allowed to deduct from her payment various charges that Defendant might have incurred on her behalf. N. Ledesma Decl. Ex. 1 ¶ 7D. The COLA provided that either party could terminate the COLA upon no less than 15 days' written notice sent by certified mail to the last known address of the other party. N. Ledesma Decl. Ex. 1 ¶ 14.

Manuel Ledesma entered into a COLA with Defendant on September 26, 2011. M. Ledesma Decl. Ex. 1 at 1. M. Ledesma Decl. Ex. 1. Green entered into a COLA with Defendant on October 2, 2013. Green Decl. Ex. 1. at 1. Valadez entered into a COLA with Defendant on September 26, 2011. Kaufmann Decl. Ex. 6 at 1. Their COLAs were identical to Nora Ledesma's for all terms set forth above. Defendant's corporate designee testified that the language was

consistent from COLA to COLA and that he was not aware of any driver negotiating any terms that were different than those initially presented to them. Kaufmann Decl. Ex. 1 at 49.

Temblador entered into a COLA with Defendant on April 21, 2015. Kaufmann Decl. Ex. 8 at 1. The COLA provided that it would be for a term of one year. Kaufmann Decl. Ex. 8 ¶ 1. It also required that Temblador have a tablet computer that was "(i) capable of hosting [Defendant's] then current mobile application ("Application"); and (ii) capable of providing real time communications from the time [Temblador] agrees to transport a shipment until delivery at destination for the reporting and recording of delivery status updates provided in accordance with customer requirements." Kaufmann Decl. Ex. 8 ¶5F. The COLA gave her the option of purchasing the tablet and services through Defendant and paying Defendant for them directly or providing her own tablet.[5] Kaufmann Decl. Ex. 8 ¶ 5F. She was required to carry the tablet in her vehicle at all times while providing services. Kaufmann Decl. Ex. 8 ¶ 5F. The tablet had to be functional and transmitting location information and delivery status information to Defendants "on a real time basis from the time [Temblador] agrees to transport a shipment until ultimate delivery." Kaufmann Decl. Ex. 8 ¶ 5F. She was prohibited from viewing or accessing the tablet while the vehicle was in motion. Kaufmann Decl. Ex. 8 ¶ 5F. She acknowledged that the satellite device and tablet were capable of providing information regarding the location of her vehicle and the tablet itself, and consented to have that information made available to Defendant "solely for purposes of ensuring compliance with applicable laws, rules and regulations (including but not limited to, verifying compliance with hours of service requirements), locating assets of [Defendant], identifying Vehicles available for dispatch and for providing delivery status updates as may be required by customers." Kaufmann Decl. Ex. 8 ¶ 5G.

Rather than providing that the parties would have to agree to any modifications to the Rate Schedule, Temblador's COLA stated that Defendant was allowed to unilaterally issue a new Rate Schedule upon 30 days' notice.[6] Kaufmann Decl. Ex. 8 ¶ 7A. The COLA provided that either

---

[5] Defendant's corporate designee was unaware of any driver providing his own tablet. Kaufmann Decl. Ex. 1 at 74.
[6] Defendant's corporate designee confirmed that Defendant could modify the rates at any time. Kaufmann Decl. Ex. 1 at 84.

party could terminate the COLA upon 30 days' written notice by certified mail to the other party's last known address. Kaufmann Decl. Ex. 8 ¶ 14. In all other respects, the COLA signed by Temblador COLA was substantially similar to the one signed by Nora Ledesma and the other Plaintiffs.

Defendant's corporate designee described how the parties used "Dispatch," an application built specifically for Defendants. Kaufmann Decl. Ex. 1 at p. 18. Dispatch was loaded onto tablets, specifically different versions of the Galaxy Note tablet. Id. at 25. Dispatchers working for Defendant would "push" offers to take loads to drivers via Dispatch. Id. at 19, 60. The driver could accept or decline a specific load. Id. Via Dispatch, the driver would indicate when he was en route to the pickup location, when he had arrived at the pickup location, and any time a similar "event happened." Id. at 20. Defendant retained the data from Dispatch for the entire claim period. Id. at 26. Defendant also retained "move history data" for each driver, which showed "each driver's name, tractor code, trip number, origin stop location, origin actual arrival date and time, origin actual departure date and time, destination stop name, destination stop location, destination actual departure date and time, and miles traveled, among other details." Def. Mot. at 19, note 13.

Dispatch also had a messaging feature, by which dispatchers communicated with drivers. Id. at 60. Dispatchers were in contact with drivers routinely, either by text or phone call. Id. at 60. Message logs from Dispatch show that dispatchers frequently sent messages to all drivers at once about whether they had "moves," "loads" or "work" available and communicated with drivers directly regarding particular jobs. Hand Decl. Exs. 8-12.

Defendant paid drivers once a week. Hand Decl. Exs. 1-7. The statements show the amount the driver received for "linehaul," and extras such as fuel surcharges and "power detentions." Hand Decl. Ex. 1. at 1. They also show how much Defendant deducted from each driver's pay for liability insurance, accident insurance, and escrow payments. Id. Plaintiffs classified themselves as self-employed on their tax returns and deducted various business expenses. Sommerfeld Decl. Exs. 7-11.

Defendant's Safety Handbook (the "Handbook") stated that the rules it contained must be

observed by all personnel in the performance of their duties and all "[v]endors, manufacturers' representatives, visitors, outside contractors, and others" while on Defendant's facilities. Kaufmann Decl. Ex. 4 at 1. It contained both "safety rules," which were mandatory, and "safe work practices," which were suggestions. Kaufmann Decl. Ex. 4 at 1. It provided that a violation of the Handbook was grounds for termination. Kaufmann Decl. Ex. 4 at 1.

It contained a specific section for "Draymen." Kaufmann Decl. Ex. 4 § L. The introduction to the Draymen section stated, "Draymen are an integral part of Intermodal operations and must be aware of and comply with the following rules while operating on CSX Intermodal Terminals Inc. terminals. Willful negligence may result in draymen being banned from CSX Intermodal Terminals Inc. property." Kaufmann Decl. Ex. 4 § L. The section contained numerous directions for how Draymen should open doors, where they should stand, and when to sound their horns, as well as safety guidelines to observe when raising landing gear. Kaufmann Decl. Ex. 4 § L. For example, it prohibited Draymen from littering, and stated that failure to comply would result in disciplinary action. Kaufmann Decl. Ex. 4 § L-10. It also prohibited Draymen from wearing open-toed shoes, sandals, or flip-flops on Defendant's facilities and recommended that they wear steel toe safety shoes. Kaufmann Decl. Ex. 4 § L-14. It required that they keep the floors and dashboards of their vehicles clear. Kaufmann Decl. Ex. 4 § L-23. It also prohibited Draymen from possessing or using personal bolt cutters while on Defendant's property. Kaufmann Decl. Ex. 4 § L-24.

Defendant had an accident policy for independent contractors and their hired drivers that required drivers to report all accidents to Defendant, no matter how minor, and required drivers to prepare a Driver's Accident Report. Kaufmann Decl. Ex. 10. at 1. The report had to include a CSX Intermodal Terminals, Inc. Motor Carrier Accident Report, a description of the accident, including a narrative and drawing, photographs of the accident scene, the police report and any citations issued, logs from the previous 24 hours and the day of the accident, and any other relevant information, such as witness statements. Kaufmann Decl. Ex. 10. at 1. A failure to make that report could result in the termination of the COLA. Kaufmann Decl. Ex. 10 at 2. Defendant also established an Accident Review Board to determine, in its sole discretion, whether an

accident was "Preventable" or "Non-Preventable." Kaufmann Decl. Ex. 10 at 2. Drivers could review a determination that the accident was Preventable. Kaufmann Decl. Ex. 10 at 2. Defendant could disqualify any driver who caused a Preventable accident. Kaufmann Decl. Ex. 10 at 3. Defendant also had a controlled substance use and alcohol testing policy that primarily mirrored federal regulations but established Post Accident Testing and Return to Work criteria that were "Company Policy, above the requirements of the FMCSR." Kaufmann Decl. Ex. 13 §§ IV.C.4, 5 (CSXIT00856).

## II.    PROCEDURAL HISTORY

Plaintiffs initiated this case as a putative class action in Alameda Superior Court on September 30, 2015, and Defendant removed it to this Court under the Class Action Fairness Act on November 25, 2015. Defendant filed a motion to dismiss on January 29, 2016, to which Plaintiffs responded by filing an amended complaint on January 29, 2016. Thereafter, the Court granted the Parties' stipulations allowing Plaintiffs to file a second and then third amended complaint on March 7, 2016 and March 22, 2016, respectively. On December 16, 2016, the Court granted the Parties' stipulation allowing Plaintiffs to file a fourth amended complaint. This is the operative complaint. In it, Plaintiffs assert the following claims based on Defendant's alleged misclassification of its Drivers as independent contractors rather than employees: (i) reimbursement of business expenses (California Labor Code Section 2802); (ii) unlawful deductions from wages (California Labor Code Section 221); (iii) failure to provide off-duty meal periods (California Labor Code Sections 226.7 and 512); (iv) failure to provide off-duty paid rest periods (California labor Code Section 226.7); (v) failure to pay minimum wage (California Labor Code Sections 1182.11, 1194); (vi) failure to timely provide wage statements (California Labor Code Section 226); (vii) violation of the California Unfair Competition Law; and (viii) PAGA claims as representatives of similarly situated Drivers. On October 26, 2017, the Court granted the parties' stipulation to strike Plaintiffs' class claims from Plaintiffs' Fourth Amended Complaint.

On January 30, 2018, Plaintiffs filed their current motion for partial summary judgment on employment status. That same day, Defendant filed a motion to strike or dismiss Plaintiffs'

PAGA claims.  On February 13, 2018, both parties filed their oppositions to each other's motions.  On February 20, 2018, both parties filed their replies in support of their own motions.   On March 6, 2018, the Court held a hearing on both motions.

### III.    DEFENDANT'S MOTION TO STRIKE OR DISMISS PLAINTIFFS' PAGA CLAIMS

Under the Labor Code Private Attorneys General Act of 2004 ("PAGA"), an "aggrieved employee" may bring a civil action personally and on behalf of other current or former employees to recover civil penalties for Labor Code violations.  See Cal. Lab. Code, § 2699(a).  The Labor and Workforce Development Agency ("LWDA") receives seventy-five percent of the civil penalties recovered, and the aggrieved employees receive the remainder.   Id. § 2699(I).  Defendant moves to strike or dismiss Plaintiffs' PAGA claims on the grounds that, because Plaintiffs seek relief on behalf of 56 Drivers, adjudication of the claims on a representative basis would be unmanageable and would interfere with Defendant's due process rights.

### A.    Rule 12(c) - Motion to Dismiss

A party may move for judgment on the pleadings "[a]fter the pleadings are closed--but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  "A motion to dismiss under either Rule 12(b)(6) or (c) is proper where the plaintiff fails to allege either a cognizable legal theory or where there is an absence of sufficient facts alleged under a cognizable legal theory."  Raphael v. Tesoro Ref. & Mktg. Co. LLC, No. 2:15-CV-02862-ODW, 2015 WL 5680310, at *1 (C.D. Cal. Sept. 25, 2015).  "In considering a Rule 12(c) motion, the district court must view the facts presented in the pleadings and the inferences to be drawn from them in the light most favorable to the nonmoving party."  Fields v. QSP, Inc., No. CV 12-1238 CAS PJWX, 2012 WL 2049528, at *3 (C.D. Cal. June 4, 2012) (citing NL Indus. v. Kaplan, 792 F.2d 896, 898 (9th Cir.1986)).

In Raphael, the court dismissed a PAGA claim on the pleadings on the grounds that the plaintiff had not given sufficient notice of the alleged violations in his letter to the Labor and Workforce Development Agency ("LWDA"), in violation of Cal. Lab. Code §§ 2699.3(a)(1) and 2699.3(b), and had failed to allege specific facts in his amended complaint.  In Fields, the court held that plaintiffs must meet the requirements of Rule 23 to proceed with a PAGA claim in

10

federal court and dismissed a PAGA claim on the pleadings because the plaintiff "admittedly" could not do so. 2012 WL 2049528, at *5. In <u>Amey v. Cinemark USA Inc</u>, the district court dismissed PAGA claims on the pleadings on the basis that the individualized determinations would be unmanageable as there were 10,000 putative class members, some of whom were not aggrieved, and the plaintiffs had not offered an "easy way to identify those who may actually [have been] aggrieved." No. 13-CV-05669-WHO, 2015 WL 2251504, at *17 (N.D. Cal. May 13, 2015), <u>rev'd on other grounds and remanded sub nom.</u> <u>Brown v. Cinemark USA, Inc.</u>, 705 F. App'x 644 (9th Cir. 2017).

Defendant relies on evidence outside the pleadings and neither takes the facts in the light most favorable to Plaintiffs nor draws inferences in favor of Plaintiffs. In short, Defendant's motion is not a motion on the pleadings. The Court denies Defendant's motion to dismiss under Rule 12(c).

**B.      Rule 12(f) - Motion to Strike**

**1.      Legal Standard**

A court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. Pro. 12(f). PAGA claims may be "immaterial" when "a representative PAGA action  is inappropriate. " <u>Patel v. Nike Retail Servs., Inc.</u>, No. 14-CV-04781-RS, 2016 WL 7188011, at *2 (N.D. Cal. Dec. 12, 2016). "The purposes of a Rule 12(f) motion is to avoid spending time and money litigating spurious issues." <u>Ortiz v. CVS Caremark Corp.</u>, No. C-12-05859 EDL, 2014 WL 1117614, at *1 (N.D. Cal. Mar. 19, 2014). "Motions to strike are disfavored because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice." <u>Bowers v. First Student, Inc.</u>, No. 2:14-CV-8866-ODW EX, 2015 WL 1862914, at *2 (C.D. Cal. Apr. 23, 2015).

In <u>Henderson v. JPMorgan Chase Bank</u>, the court held that the fact "that it may ultimately be difficult or unmanageable for [p]laintiffs to prove their case is not a reason for the Court to strike the PAGA allegations." No. CV113428PSGPLAX, 2013 WL 12126772, at *6 (C.D. Cal. July 10, 2013). Similarly, in <u>Hibbs-Rines v. Seagate Techs., LLC.</u>, the court acknowledged that the plaintiff would have a difficult time proving her allegations, but held that it was not necessary

to strike them. No. C 08-05430 SI, 2009 WL 513496, at *4 (N.D. Cal. Mar. 2, 2009). There, the plaintiff had alleged PAGA violations on behalf of a wide group of employees: "any person, regardless of job title, who was primarily engaged in the design, installation, or configuration of computer networks . . . the writing or testing of computer software, and . . . backup and recovery of computer data." Id. at *1. The court noted that plaintiff's PAGA claim might be "overly broad," but held it was not necessary to strike the allegations as she would not be able to recover penalties under PAGA unless she could "prove labor code violations with respect to each and every individual on whose behalf" she sought to recover. Id. at *4.

By contrast, some courts, including this one, have stricken PAGA claims as unmanageable. In Ortiz, this Court held that a PAGA claim was unmanageable where the plaintiffs alleged that the defendants had failed to compensate employees for off-the-clock work, noting that a multitude of individual assessments would be necessary and that the plaintiffs would have to rebut a presumption that the individual employees were not working off-the-clock because the defendants had kept records of employees clocking in and out. 2014 WL 1117614 at *4. The Court was careful to note that the mere presence of individualized inquires did not make PAGA claims unmanageable in general. Id. (citing Plaisted v. Dress Barn, Inc., No. 2:12-CV-01679-ODW, 2012 WL 4356158, at *2 (C.D. Cal. Sept. 20, 2012) ("And unlike class or representative actions seeking damages or injunctive relief for injured employees, the purpose of PAGA 'is to incentivize private parties to recover civil penalties for the government that otherwise may not have been assessed and collected by overburdened state enforcement agencies.' To hold that a PAGA action could not be maintained because the individual assessments regarding whether a violation had occurred would make the claim unmanageable at trial would obliterate this purpose, as every PAGA action in some way requires some individualized assessment regarding whether a Labor Code violation has occurred.")).

Similarly, in Brown v. Am. Airlines, Inc., the court struck the plaintiff's PAGA claims regarding unpaid overtime wages for manageability issues but allowed the plaintiff's PAGA claims regarding wage statements that reflected two different pay periods to go forward. No. CV 10-8431-AG (PJWX), 2015 WL 6735217, at *4 (C.D. Cal. Oct. 5, 2015). See also Bowers v. First

1    Student, Inc., No. 2:14-CV-8866-ODW EX, 2015 WL 1862914, at *4 (C.D. Cal. Apr. 23, 2015)

2    (stating with little explanation that an alternate basis for dismissing the plaintiff's PAGA claim

3    was that it would be unmanageable because it would require a "multitude of individual

4    assessments"); Litty v. Merrill Lynch & Co., No. CV 14-0425 PA PJWX, 2014 WL 5904904, at

5    *2 (C.D. Cal. Nov. 10, 2014) (striking class and collective action allegations following a separate

6    ruling on class certification that "judicial economy would not be advanced by allowing [the] suit

7    to proceed as a collective action").

8          Relying on Brown, Bowers, and Litty, the district court in Patel v. Nike Retail Servs., Inc.,

9    agreed that "there might be circumstances under which it would be inappropriate to allow a PAGA

10    claim to proceed on a representative basis." No. 14-CV-04781-RS, 2016 WL 7188011, at *4

11    (N.D. Cal. Dec. 12, 2016). However, the court held that the defendant's motion to strike the claim

12    was "premature." There, the plaintiff had asserted that there would be "far less" than 96 aggrieved

13    employees at issue and pointed out that PAGA has a one year statute of limitations. Id. The court

14    denied the defendant's motion but left open the possibility that the defendant could raise its

15    manageability concerns again after discovery. Id.

16          Although recognizing the California district court split on the issue, the district court in

17    Tseng v. Nordstrom, Inc. declined to impose a manageability requirement on PAGA claims in

18    "light of PAGA's purpose to serve as a 'law enforcement action designed to benefit the public and

19    not to benefit private parties.'" No. CV11-8471-CAS(MRWX), 2016 WL 7403288, at *5 (C.D.

20    Cal. Dec. 19, 2016 (quoting Arias v. Superior Court, 46 Cal. 4th 969, 986 (2009)). See also

21    Zackaria v. Wal-Mart Stores, Inc., 142 F. Supp. 3d 949, 959 (C.D. Cal. 2015) ("Holding that

22    individualized liability determinations make representative PAGA actions unmanageable, and

23    therefore untenable, would impose a barrier on such actions that the state law enforcement agency

24    does not face when it litigates those cases itself.").

25          However, even if PAGA itself does not include a manageability requirement, a district

26    court may strike a PAGA claim that is unmanageable as an exercise of its inherent authority. A

27    "district court possesses inherent powers that are 'governed not by rule or statute but by the

28    control necessarily vested in courts to manage their own affairs so as to achieve the orderly and

expeditious disposition of cases.'" Dietz v. Bouldin, __ U.S.__, 136 S. Ct. 1885, 1891 (2016) (quoting Link v. Wabash R. Co., 370 U.S. 626, 630–631 (1962)). In Ortiz v. CVS Caremark Corp., this Court declined to certify for interlocutory review its decision to strike the plaintiff's claims on manageability grounds. No. C-12-05859 EDL, 2014 WL 12644254, at *2 (N.D. Cal. May 30, 2014). In response to the plaintiffs' argument that the Court had improperly applied Rule 23's requirements to PAGA, the Court cited its "inherent authority to control its cases" as a basis for its decision. See also Salazar v. McDonald's Corp., No. 14-CV-02096-RS, 2017 WL 88999, at *8 (N.D. Cal. Jan. 5, 2017) (apparently basing its decision to strike a PAGA claim on unmanageability grounds in part on its inherent power although stating that it remained "unclear" whether the scope of the court's inherent power allowed it to take manageability into account when determining the propriety of class treatment). Absent further guidance from the appellate courts, the Court does not revisit its determination in Ortiz that it may, in some specific circumstances, be appropriate to strike PAGA claims on the grounds that they are unmanageable.

## 2. Discussion

Defendant has not outlined any standards for determining whether a PAGA claim would require so many individualzed determinations as to be unmanageable. Plaintiffs suggest that class certification jurisprudence in similar cases demonstrates that the PAGA claims here would not be unmanageable. These cases are helpful to the extent that they show that cases that depend on plaintiffs' employment status can be manageable as class actions, but by referring to them, the Court does not suggest that a PAGA claim would be necessarily unmanageable just because the plaintiff cannot meet the strict Rule 23 class action requirements. Indeed, this Court has previously determined that plaintiffs do not need to satisfy the Rule 23 requirements in order to bring their PAGA claim. Ortiz, 2014 WL 1117614, at * 2 (collecting cases within the Northern District of California that have come to the same conclusion). The Ninth Circuit has not yet ruled on this issue. See Baumann v. Chase Inv. Servs. Corp., 747 F.3d 1117, 1124 (9th Cir. 2014) (noting many ways in which PAGA claims were different from Rule 23 class actions and holding that PAGA claims were not sufficiently similar to class actions under Rule 23 to establish federal subject matter jurisdiction for PAGA claims under the Class Action Fairness Act but stating that it

1  would not decide whether PAGA claim could "proceed under Rule 23 as a class action").

2            **a.**        **Employment Status**

3        As set forth in more detail in Section IV regarding Plaintiffs' motion for summary

4  judgment on employment status, Plaintiffs' wage and hour claims derive from its assertion that

5  Defendant misclassified Plaintiffs as independent contractors instead of employees.  Accordingly,

6  one of the central issues in this case is whether Plaintiffs and other Drivers are employees or

7  independent contractors.  Defendant argue that deciding this issue with respect to Plaintiffs'

8  PAGA claims would require too many individualized determinations.

9        Under California law, the right-to-control test is central to the determination of

10  employment status.  Alexander v. FedEx Ground Package Sys., Inc., 765 F.3d 981, 988 (9th Cir.

11  2014). [7]  In misclassification cases, the relevant inquiry at the class certification stage "is not what

12  degree of control" the defendant "retained over the manner and means" of its workers, "it is,

13  instead, a question one step further removed: Is [the defendant's] right of control over its

14  [workers], whether great or small, sufficiently uniform to permit classwide assessment?"  Ayala v.

15  Antelope Valley Newspapers, Inc., 59 Cal. 4th 522, 533 (2014).  Often, the primary evidence of

16  control will be a written contract that spells out the parties' rights, including to what extent the

17  hirer has the right to control.  Id.  At the class certification stage, the court may also "consider

18  what control is 'necessary' given the nature of the work, whether evidence of the parties' course of

19  conduct will be required to evaluate whether such control was retained, and whether that course of

20  conduct is susceptible to common proof—i.e., whether evidence of the parties' conduct indicates

21  similar retained rights vis-à-vis each hiree, or suggests variable rights, such that individual proof

22  would need to be managed."  Id. (quoting S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations,

23  48 Cal. 3d 341, 357 (1989)).

24        In Bowerman v. Field Asset Servs., Inc., the court held that because the hirer had "retained

25

26  [7] By contrast, the D.C. Circuit has replaced the control test with an "entrepreneurial-opportunities"
test.  Alexander, 765 F.3d at 993 (citing FedEx Home Delivery v. National Labor Relations Board,

27  563 F.3d 492 (D.C. Cir. 2009)).  "California cases indicate that entrepreneurial opportunities do
not undermine a finding of employee status," particularly where the putative employer retains

28  some control over those opportunities, such as the power to approve or disapprove of the workers'
hiring decisions.  Id.

'all necessary control' over the vendors' work," the fact that there were some instances where the hirer "may not have exercised its right to control in a manner consistent with an employee relationship" did not defeat class certification. 242 F. Supp. 3d 910, 933 (N.D. Cal. 2017). The court also noted that many of the defendants' arguments that the case would require individualized evidence related to damages, not liability, which the Ninth Circuit has held cannot, by itself, defeat class certification. Id. (citing Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1131 (9th Cir.), cert. denied, 138 S. Ct. 313 (2017)). Similarly, in Shepard v. Lowe's HIW, Inc., the court certified a class despite the defendant's argument that the independent contractor analysis would turn on each class member's experiences, because the main question, whether the defendant had a right to control the putative class members, as well as many of the secondary indicia of classification, would turn on common inquiries. No. C 12-3893 JSW, 2013 WL 4488802, at *5 (N.D. Cal. Aug. 19, 2013). The court held that class certification was appropriate because "the contract and standards at issue are substantially identical and provide the legal structure for the relationship and the scope of [the defendant's] right to control the [workers]." Id. In Ali v. U.S.A. Cab Ltd., the court of appeals upheld the superior court's decision not to certify a class on the ground that common issues did not predominate, holding that it was not "improper" to consider the taxi drivers' individual declarations, which included statements that they subjectively believed that they were independent contractors because the parties' subjective belief is one of the secondary indicia of employee status. 176 Cal. App. 4th 1333, 1352 (2009). Significantly, the court noted that there was no suggestion that the superior "court relied solely on the declarants' beliefs or unduly focused on that factor." Id. Moreover, the court determined that "even ignoring the paragraphs pertaining to the declarants' beliefs, the declarations provide[d] substantial evidence to support a finding that common factual issues [did] not predominate." Id.

Plaintiffs argue that their PAGA claims are manageable because whether Plaintiffs, and other Drivers, are employees will depend on the right to control demonstrated in the largely uniform COLAs and in Defendant's general policies, including how it assigns work to, monitors, and pays Drivers. Defendant asserts that there are significant variations in the COLAs, including that some allowed for termination without any notice. Mot. at 17. The COLA Defendant cites in

16

support of that assertion provides for termination upon 30 days' notice. Hand MSJ Decl. Ex. G. Otherwise, the difference in notice are between 15 days and 30 days. More importantly, none of them required any reason for termination. Defendant also states that the Court will have to take into account the fact that some of the COLAs had different lengths than the others. For support, Defendant cites to the one COLA that provided for a one-year term. All the others provided for 30-day terms that automatically renewed. As the shorter COLAs automatically renewed and the Plaintiffs who performed drayage services under those COLAs all worked for Defendant for at least one year, these modest variations in the COLAs are not significant.

Defendant also argues that, to determine employment status, the Court will have to inquire into each of the 56 Driver's "day-to-day, week-to-week routines, activities and interactions" with Defendant. Def. Mot. at 11. However, Defendant's own motion to strike Plaintiffs' PAGA claims demonstrates that, overall, the Court's decision on employment status will turn on issues of common proof. Defendant makes the following claims about the Drivers as a group. Drivers chose the routes to their destinations. Mot. at 11. All drivers had the right to hire other drivers to run routes for them. Id. Drivers controlled the days and hours they worked. Id. Drivers were responsible for their own trucking expenses and were employed in a skilled trade. Mot. at 14, note 10. Each COLA provided remuneration per load rather than an hourly wage. Id. Each driver signed a COLA that stated the driver would be an independent contractor. Def. Mot. at 18. All of the drivers classified themselves as "self-employed" on their tax returns. Id. All the drivers work in a field that is "heavily regulated by federal law" for which they must "undergo specialized training, certification, and re-certification." Def. Mot. at 15.

Defendant argues that, to determine whether Defendant controlled Drivers' work, the Court will have to decide whether Defendant retaliated against Drivers for turning down loads. Plaintiffs respond that they do not need to show whether Defendant exercised its control by retaliating against Drivers for turning down loads because they will be able to show that Defendant had the power to do so, and differences in whether Defendant exercised that power do not matter. Defendant also argues points out that some Drivers made decisions to maximize their profits and that many Drivers subjectively believed they were creating independent contractor

17

relationships.

The differences that Defendant raises do not make the determination of whether all Drivers were independent contractors or employees unmanageable. The majority of Defendant's arguments show only that there were some variations in how Defendant and Drivers exercised their rights under the COLA, not that there were variations in the control that Defendant retained.

### b. Derivative Claims

Defendant also argues that, even if the Court can determine that the 56 Drivers, as a group, were employees, Plaintiffs' PAGA claims are unmanageable because the wage and hour claims that derive from that determination will require too many individualized inquiries. Plaintiffs assert claims for wage statement violations, missed meal periods, rest breaks, unreimbursed business expenses, and working unproductive time for which they were not compensated. Defendant acknowledges that the wage statement violation claim "succeeds or fails" based on employment status, but argues that the rest break, meal period, and business expense claims are not susceptible to common proof. Plaintiffs argue that Defendant imposed the same policies or lack of policies with respect to all Drivers relative to these wage laws, so Defendant's arguments as to variations in the frequency of violations or the penalties per Driver do not make the case unmanageable. See Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1131 (9th Cir.), cert. denied, 138 S. Ct. 313 (2017).

Because Defendant classified Drivers as independent contractors, it did not have policies in place to comply with wage laws that applied to employees. Plaintiffs argue that because Defendant failed to maintain records relevant to these potential violations, Plaintiffs will be able to establish violations based on reasonable inferences from a representative sample. In Villalpando v. Exel Direct Inc., the court held that the plaintiffs had provided common proof that they were not compensated for all the time they worked by showing emails and agendas for morning meetings, which were mandatory but which they were not paid to attend. No. 12-CV-04137-JCS, 2016 WL 1598663, at *2, 12 (N.D. Cal. Apr. 21, 2016). The court determined that damages could be determined through common proof because, based on the employer defendant's failure to maintain adequate records, the plaintiffs were entitled to prove their damages through a representative

United States District Court
Northern District of California

sample.  Id.  See also Bell v. Farmers Ins. Exch., 115 Cal. App. 4th 715, 750 (2004) (authorizing "determination of aggregate damages on the basis of statistical inferences");  Melgar v. CSk Auto, Inc., No. 13-CV-03769-EMC, 2015 WL 9303977, at *9 (N.D. Cal. Dec. 22, 2015), aff'd, 681 F. App'x 605 (9th Cir. 2017).

However, these cases rely on an employer's statutory duty to keep certain records. Plaintiffs have not identified statutes requiring employers to keep records relevant to their claims. Employers are required to keep time records of when employees begin and end each work period. See Hernandez v. Mendoza, 199 Cal. App. 3d 721, 727 (1988) (holding that "where the employer has failed to keep records required by statute, the consequences for such failure should fall on the employer, not the employee") (citing Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680 (1945)). However, employers "are not obligated to keep records of rest breaks." In re: Autozone, Inc., No. 3:10-MD-02159-CRB, 2016 WL 4208200, at *14 (N.D. Cal. Aug. 10, 2016). In Autozone, the court decertified a rest break class on the basis that there were no records of rest breaks and "no uniform policy or practice forbidding appropriate rest breaks" and mini-trials for 20,000 class members would be unmanageable.  Id.; see also Vasquez v. First Student, Inc., No. 2:14-CV-06760-ODW EX, 2015 WL 1125643, at *9 (C.D. Cal. Mar. 12, 2015) (holding that collective action for rest breaks for a class with over 8,000 members would be unmanageable where there were conflicting declarations about whether rest breaks were taken and the plaintiffs had not "proffered a viable class-wide method of showing whether any rest break policy was actually implemented). Similarly, in Raphael, the court held that a PAGA claim brought on behalf of "thousands of other current or past employees" would be unmanageable where the plaintiff was asserting meal and rest period violations, failure to pay overtime,  failure to reimburse for necessary business-related expenses, and other claims.  2015 WL 5680310, at *3.

Nevertheless, while these derivative claims may require individualized proof, Defendant has not shown that they are as hard to manage as the claims in the cases on which Defendant relies.  Those claims were brought on behalf of thousands of employees, whereas Plaintiffs assert claims on behalf of only 56 Drivers.  Moreover, Plaintiffs and Defendant should have records of

business expenses from their tax filings and their wage statements,[8] and Defendant has retained extensive data on exactly when and where Drivers were working.[9] While the ultimate resolution of the claims still requires some individualized inquiries, Defendant has not shown that those inquiries would be so unmanageable as to justify striking Plaintiffs' PAGA claims.

### c. Due Process

Defendant argues that allowing Plaintiffs' PAGA claims to go forward would infringe its due process rights to confront and cross-examine witnesses. This argument is not persuasive because it would apply with nearly equal force in every PAGA case and because the cases Defendant relies upon are readily distinguishable or actually held that there would not be a violation of due process rights. In Henderson, the court acknowledged the defendant-employer's due process right to cross-examine and confront witnesses, but held that allowing the PAGA claim to go forward would not infringe those rights or the due process rights of absent employees. Henderson v. JPMorgan Chase Bank, No. CV113428PSGPLAX, 2013 WL 12126772, at *7 (C.D. Cal. July 10, 2013). In Wal-Mart Stores, Inc. v. Dukes, the Supreme Court reversed a class certification decision in a sex discrimination in employment case on due process grounds because the court had proposed to determine average backpay awards based on a sample set of the 1.5 million putative class members, without providing for individualized inquiries in which the defendant employer could raise affirmative defenses. 564 U.S. 338, 366 (2011). In In re Chevron U.S.A., Inc., the Fifth Circuit cited due process concerns as one reason for rejecting the district court's plan to determine liability for 3,000 plaintiffs based on the outcomes of trials for 30 plaintiffs, without first ensuring that those 30 plaintiffs were an accurate representation of the 3,000. 109 F.3d 1016, 1020-21 (5th Cir. 1997). Wal-Mart and Chevron are distinguishable because they did not involve PAGA claims and each had far more putative class members than the 56 potentially aggrieved employees here. Moreover, because Plaintiffs have not yet proposed a

---

[8] The wage statements show, for example, deductions for insurance by Defendant. Hand Decl. Exs. 1-8.

[9] In Defendant's own words, it has "move history data" for each Driver that shows "each driver's name, tractor code, trip number, origin stop location, origin actual arrival date and time, origin actual departure date and time, destination stop name, destination stop location, destination actual departure date and time, and miles traveled." Def. Mot. at 19, note 10.

method of determining Defendant's liability to all potentially aggrieved employees, the Court cannot determine whether trial here would raise the same due process concerns that made the Wal-Mart and Chevron plans untenable.

Defendants also argue that allowing the PAGA claims to proceed will infringe their due process rights because if Plaintiffs successfully establish that Defendants have violated labor laws, nonparty employees may invoke collateral estoppel to use that judgment against Defendant in other actions. Arias v. Superior Court, 46 Cal. 4th 969, 987 (2009). However, the California Supreme Court has held that the operation of one-way collateral estoppel in PAGA claims does not infringe an employer's due process rights. Id. ("Because an action under the act is designed to protect the public, and the potential impact on remedies other than civil penalties is ancillary to the action's primary objective, the one-way operation of collateral estoppel in this limited situation does not violate the employer's right to due process of law.").

### d. Conclusion

The Court **DENIES** Defendant's motion to strike or dismiss Plaintiffs' PAGA claims on the grounds that they are unmanageable. However, Defendant may raise this issue again if, as trial approaches, Defendant can make a good faith argument that does not relitigate issues decided here that Plaintiffs do not propose a plan for trial that is manageable and protects Defendant's due process rights.

## IV. PLAINTIFFS' MOTION FOR PARTIAL SUMAMRY JUDGMENT ON EMPLOYMENT STATUS

"Much 20th-century legislation for the protection of 'employees' has adopted the 'independent contractor' distinction as an express or implied limitation on coverage." S. G. Borello & Sons, Inc. v. Dep't of Indus. Relations, 48 Cal. 3d 341, 350 (1989). Accordingly, a company's liability for labor code violations will often turn on whether the workers are properly classified as employees or independent contractors. Plaintiffs seek summary judgment on their employment status.

### A. Legal Standard

The court should grant summary judgment when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); The court must view "the facts in the light most favorable to the non-moving party." Alexander v. FedEx Ground Package Sys., Inc., 765 F.3d 981, 987 (9th Cir. 2014). The court must draw all justifiable inferences from those facts in favor of the non-moving party and must refrain from making credibility determinations and weighing evidence. Narayan v. EGL, Inc., 616 F.3d 895, 899 (9th Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

"[U]nder California law, once a plaintiff comes forward with evidence that he provided services for an employer, the employee has established a prima facie case that the relationship was one of employer/employee." Narayan, 616 F.3d at 900. The burden then "shifts to the employer, which may prove, if it can, that the presumed employee was an independent contractor." Id. "The principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired." Alexander, 765 F.3d at 988 (internal quotations omitted) (quoting Borello, 48 Cal. 3d at 350). What matters is not "how much control a hirer exercises, but how much control the hirer retains the right to exercise." Ayala v. Antelope Valley Newspapers, Inc., 59 Cal. 4th 522, 533 (2014) (emphasis omitted). The "right-to-control test does not require absolute control. Employee status may still be found where "[a] certain amount of ... freedom is inherent in the work.'" Alexander, 765 F.3d at 990 (quoting Air Couriers Int'l v. Emp't Dev. Dep't, 150 Cal.App.4th 923 (2007)). Courts must determine what level of control is "necessary" depending on the nature of the work. Borello, 48 Cal. at 356-57.

In addition to the right to control test, California courts have identified several secondary indicia of employment status that may guide court's decisions, derived from the Restatement Second of Agency:

> (a) whether the one performing services is engaged in a distinct occupation or business;
> (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision;
> (c) the skill required in the particular occupation;
> (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (e) the length of time for which the services are to be performed;
> (f) the method of payment, whether by the time or by the job;

(g) whether or not the work is a part of the regular business of the principal; and
(h) whether or not the parties believe they are creating the relationship of employer-employee.

Borello, 48 Cal. 3d at 351. "Generally, ... the individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." Id. (quoting Germann v. Workers' Comp. Appeals Bd., 123 Cal.App.3d 776, 783 (1981)).

California courts have also found that the following factors, which overlap to some extent with those from the Restatement, are "logically pertinent to the inherently difficult determination" of employment status:

(1) the alleged employee's opportunity for profit or loss depending on his managerial skill;
(2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
(3) whether the service rendered requires a special skill;
(4) the degree of permanence of the working relationship; and
(5) whether the service rendered is an integral part of the alleged employer's business.

Borello, 48 Cal. 3d at 355.

Determination of employment status is a mixed question of fact and law. O'Connor v. Uber Techs., Inc., 82 F. Supp. 3d 1133, 1146 (N.D. Cal. 2015). Because of the many factors the Court must weigh, summary judgment on this question is rarely appropriate. See Narayan, 616 F.3d at 901.

[If] reasonable people could differ on whether a worker is an employee or an independent contractor based on the evidence in the case, the question is not for a court to decide; it must go to the jury. This is true even if no significant dispute exists about the underlying facts, because the act of weighing and applying numerous intertwined factors, based on particular facts, is itself generally the job of the jury.

Cotter v. Lyft, Inc., 60 F. Supp. 3d 1067, 1076–77 (N.D. Cal. 2015). The court may grant summary judgment only if it concludes that only a single inference and conclusion may be drawn from all the facts. Id. However, that does not mean that the court cannot determine employment status as a matter of law unless all the factors in this multi-factor test must point in the same direction. Id. at 1077. Summary judgment is appropriate if the court concludes that the arrow points "so strongly in the direction of one status or the other that no reasonable juror could" come

to the opposite conclusion after applying California's multi-factor test. Id. at 1078.

In Borello, the California Supreme Court that established the right to control test. 48 Cal. 3d at 350. There, the Division of Labor Standards Enforcement (the "Division") of the Department of Industrial Relations took evidence on whether workers who harvested cucumbers for a grower were employees or independent contractors. Id. at 345. The Division determined that they were employees, but the Court of Appeals reversed the Division's decision, holding that the workers were independent contractors as a matter of law. Id. The Supreme Court reversed. Id. at 346. The California Supreme Court held that the defendant growers had retained all necessary control over the harvest portion of their operations, which were performed by migrant harvesters, because the work was simple and could "be performed in only one correct way." Borello, 48 Cal. at 356-57. Moreover, the growers controlled all the "meaningful aspects" of the "business relationship." Id. (quoting Donovan v. Gillmor, 535 F. Supp. 154, 161 (N.D. Ohio 1982)).

In Narayan v. EGL, Inc., the Ninth Circuit reversed the district court's summary judgment holding that the drivers were independent contractors. 616 F.3d 895, 904 (9th Cir. 2010). The district court had determined that the drivers were independent contractors under Texas law, placing significant weight on the fact that the drivers had signed contracts acknowledging that they were independent contractors. Id. at 904-04. The Ninth Circuit held that California law should apply and observed that those labels are not dispositive under California law. Id. Relying on Borello, the court described the multi-factor test used to determine employment status in California. The court listed several facts that indicated there was an employment relationship, including the automatic renewal of the contracts, termination on thirty-days' notice or upon breach of the contract, the relatively low level of skill required, and the length and indefinite nature of the plaintiffs' tenure with the defendant. Id. at 903-04. The court found persuasive an observation by Judge Easterbrook in a case applying an analogous test:

> [i]f we are to have multiple factors, we should also have a trial. A fact-bound approach calling for the balancing of incommensurables, an approach in which no ascertainable legal rule determines a unique outcome, is one in which the trier of fact plays the principal part. That there is a legal overlay to the factual question does not affect the role of the trier of fact.

United States District Court
Northern District of California

*Id.* at 901 (quoting Sec'y of Labor v. Lauritzen, 835 F.2d 1529, 1542 (7th Cir.1987) (Easterbrook, J., concurring) (internal citations omitted)). The court held that there were "at the very least sufficient indicia of an employment relationship" to deny summary judgment to defendant. *Id.* The court did not consider whether summary judgment in favor of the plaintiffs would have been appropriate, as the plaintiffs had not moved for summary judgment.

By contrast, in both Alexander and Ruiz v. Affinity Logistics Corp., 754 F.3d 1093, 1105 (9th Cir. 2014), the defendants retained and exercised pervasive control over the drivers, justifying a finding that the drivers were employers as a matter of law. In Alexander, the Ninth Circuit held that drivers for FedEx Ground Package System, Inc. ("FedEx") were employees as a matter of law because the most important factor, the right-to-control, strongly favored employees status while the other factors did not strongly favor either status. 765 F.3d at 997. There, the defendant controlled the appearance of its drivers, including requiring them to wear uniforms and conform to certain grooming standards, and their vehicles, requiring them to paint them a specific shade of white, have specific dimensions, and have specific shelves inside. *Id.* at 989. The defendant controlled the times the drivers worked. *Id.* at 989-90. The defendant controlled aspects of how and when the drivers delivered their packages by assigning each driver a specific service area, negotiating a delivery window with the customers, and imposing customer service requirements. *Id.* at 990.

Similarly, in Ruiz, the Ninth Circuit reversed the trial court's ruling, following a trial, that furniture and appliance delivery drivers were independent contractors and held that the drivers were employees as a matter of law. 754 F.3d at 1105. The defendant, a furniture delivery company, "controlled the drivers' rates, schedules, and routes," "set the drivers' flat 'per stop' rate," "decided the days drivers worked, and retained the discretion to deny drivers' requests for days off," "determined routes, and instructed drivers not to deviate from the order of deliveries listed on the route manifests" that the defendant created. *Id.* at 1101. The "drivers could not negotiate for higher rates, as independent contractors commonly can." *Id.* The defendant "also controlled the equipment—the trucks, tools, and mobile phones—and the helpers the drivers used." *Id.* Finally, the defendant controlled the drivers' appearances, by imposing strict grooming

25

standards and requiring them to wear uniforms.  Id.  The court held that the right to control test "overwhelmingly" indicated that the drivers were employees.  Id. at 1103.  See also Villalpando v. Exel Direct Inc., No. 12-CV-04137-JCS, 2015 WL 5179486, at *48 (N.D. Cal. Sept. 3, 2015) (providing thorough discussion of Alexander and Ruiz and holding that plaintiffs, who picked up and delivered furniture, were employees for much the same reasons as in Alexander and Ruiz).

However, when a reasonable jury could come to different conclusions after applying the multi-factor test for employment status, either because there were material disputes of fact or the undisputed facts could support different inferences, courts within this district have denied summary judgment.  For example, in Cotter v. Lyft, Inc., both the defendant, Lyft, and the plaintiffs, Lyft's drivers, moved for summary judgment on the drivers' employment status.  60 F. Supp. 3d 1067, 1074 (N.D. Cal. 2015).  The court denied both motions, holding that material questions of fact remained regarding Lyft's control over its drivers.  Id. at 1080-81.  Lyft operated a smartphone application that matched passengers with nearby drivers.  Id. at 1070.  The Lyft driver transported the passengers in the driver's personal car, which was marked with a distinct pink mustache.  Id.  Before accepting a driver, Lyft inspected the car, performed a background check on the driver, and had the driver submit to an in-person interview.  Id.  During the time that the plaintiffs in Cotter drove for Lyft, Lyft operated on a donation basis.  Id.  Lyft suggested a donation for the ride and the passenger chose whether to pay that amount, a different amount, or nothing at all.  Id.  Lyft retained a 20% administrative fee from each charge and paid the rest to the driver, on a weekly basis.  Id.  The agreement between Lyft and the drivers allowed both parties to terminate the agreement for "for any or no reason" at any time.  Id. at 1072.

Lyft allowed drivers to request certain schedules in advance, which Lyft would accept or reject.  Id. at 1071.  Lyft also allowed drivers to reserve certain hours, or log onto the driving application at any time, but only if Lyft did not already have enough signed up.  Id.  During those shifts, when a Lyft passenger requested a ride, Lyft matched the rider to a nearby driver, who could accept or reject the ride.  Id. at 1070.  Lyft tracked what percentage of rides each driver accepts and informed drivers that a rate above 90% is excellent while a rate below 75% needs improvement.  Id. at 1071.  Lyft warned drivers if their acceptance rates were too low.  Id.  Lyft

26

1  deactivated a driver's account if the driver received three warnings.  Id.  Lyft also allowed the

2  passengers to rate their Lyft drivers and terminated drivers whose star rating fell below a certain

3  threshold.  Id.  Lyft also published "rules to live by" that specified how drivers should keep their

4  cars, how drivers should greet and interact with passengers, that drivers cannot have any of their

5  own passengers, and that Lyft drivers should not pick up passengers who attempt to hail them on

6  the street.  Id.  at 1072.  During the time that one of the plaintiffs drove for Lyft, Lyft replaced the

7  rules with a set of frequently asked questions ("FAQs") on the same subjects but with more detail.

8  Id. at 1072-73.

9      The court held that it could not determine as a matter of law that the drivers were

10  independent contractors because Lyft exerted a great deal of control over how drivers provided the

11  rides, although there was some ambiguity over the consequences for ignoring those rules.  Id. at

12  1079.  The court also held that it could not determine as a matter of law that the drivers were

13  employees, because the drivers "enjoyed great flexibility in when and how often to work," were

14  never required to adhere to appearance standards, could accept or reject individual rides, did not

15  drive for Lyft full time, and had minimal contact with Lyft management during their tenure.  Id. at

16  1081.  The court distinguished the case from Ruiz and Alexander where there was overwhelming

17  evidence that the employer had retained control over "exquisite detail" of the drivers' day-to-day

18  work.  Id. at 1081.

19      Similarly, in O'Connor v. Uber Techs., Inc., the court denied the defendant Uber's motion

20  for summary judgment on employment status.  82 F. Supp. 3d 1133, 1135 (N.D. Cal. 2015).  Like

21  Lyft, Uber paired passengers with drivers based on a smartphone application that Uber developed.

22  Id. at1135.  Aspiring drivers had to apply to Uber, which required uploading their driver's license

23  information, undergoing a background check by a third-party, passing a "city knowledge" test, and

24  attending an interview with an Uber employee.  Id. at 1136.  Uber set the fares for each ride,

25  principally based on duration of the ride and miles travelled.  Id. at 1136.  It received the entire

26  fare and then remitted approximately 80% to the driver.  Id.  Uber argued that the drivers were

27  independent contractors because they could work as little or as much as they chose, so long as they

28  gave one ride every 180 days on one of the Uber platforms, or one ride every 30 days on a

different one.  Id. at 1148-49.  Uber also argued that drivers were free to reject any ride they were offered and that they did not control how the drivers provided the rides.  Id.  The drivers disputed these assertions, pointing to statements in an Uber Driver Handbook that set expectations for drivers, including that they should accept all rides when they were on duty and that they should be dressed professionally, text the passenger right before pickup, make sure the radio is off or soft jazz is playing, and open the door for passengers.  Id.  at 1149.  In light of this dispute, the court held that Uber had not satisfied the summary judgment standard.  Id.

Relying on O'Conner, the district court in Lawson v. Grubhub denied a defendant's motion for summary judgment on employment status, noting that a determination of employment status is "difficult to meet at the summary judgment stage."  Lawson v. Grubhub, Inc., No. 15-CV-05128-JSC, 2017 WL 2951608, at *1, 3 (N.D. Cal. July 10, 2017).  The defendant was Grubhub, an online and mobile food ordering company.  Grubhub users placed orders for pick up or delivery using Grubhub's platform.  Id.  The plaintiff in that case, Raef Lawson, worked as a delivery driver for Grubhub from August 2015 to February 2016.  Id. Lawson sued Grubhub, alleging that he was misclassified as an independent contractor instead of an employee and was entitled to labor protections including reimbursement of business expenses, minimum wage, and overtime.  Id.

Grubhub moved for summary judgment.  Id.  Lawson opposed the motion but did not file a cross-motion. Id.  The court denied Grubhub's motion for summary judgment, concluding that there were material issues of disputed fact as to whether Lawson should have been classified as an employee.  Id.  The court held that a reasonable trier of fact could find that Grubhub had the right to exercise all necessary control over Lawson's work.  Id. at *4.  The fact that either Grubhub or Lawson could terminate their relationship with 14 days' notice indicated an at-will employment relationship.  Id.  Drivers signed up for specific blocks of time, set by Grubhub managers, during which the drivers had to remain available and deliver the majority of the orders that they received.  Id.  The service agreement that drivers signed stated that drivers should not reject incoming orders during a scheduled delivery block and that drivers could be terminated for breaching the agreement.  Id.

The court also considered the secondary factors.  Several factors favored finding an

employment relationship, including that the occupation did not require a high level of skill, that the tenure of relationship was indefinite, that Grubhub drivers are central to Grubhub's business, that Grubhub pays drivers weekly based a combination of a per delivery fee and an hourly wage, and that Grubhub reviews complaints about its drivers. Id. at *5-6.

At the same time, some factors weighed in favor of finding that the drivers were independent contractors. Id. at *6. Drivers supplied their own equipment and are not required to wear Grubhub clothes. Id. They were not required to work in a particular location. Id. They were allowed to work for other companies. Id. Drivers believed that they were independent contractors. Id. The court held that these factors were not dispositive and denied Grubhub's motion because there existed "*at the very least* sufficient indicia of an employment relationship" for a reasonable jury to find the existence of such a relationship. Id. (emphasis added).

After conducting a trial in that same case, the court found that Lawson was an independent contractor. Lawson v. Grubhub, Inc., No. 15-CV-05128-JSC, 2018 WL 776354, at *1-2 (N.D. Cal. Feb. 8, 2018). The evidence at trial showed that Grubhub had retained much less control than had appeared at summary judgment. An amended version of the agreement was in place during most of Lawson's tenure with Grubhub. Id. at *4. The amended agreement removed language suggesting that drivers had to sign up for weekly blocks and could not reject incoming orders during their blocks. Id. The amendment also changed the way that drivers were compensated by emailing them a service fee for each delivery, which they could accept or reject. Id. While Grubhub provided uniforms and training videos, it was not mandatory that drivers wear them or watch them. Id. at *4-5. Drivers were not required to mark their vehicles with any Grubhub logo or use Grubhub insulated food warming bags. Id. at *5. Grubhub allowed delivery workers to make their deliveries by car, motorcycle, bicycle or scooter and never saw, let alone inspected, the vehicles that drivers used. Id. at *11. Grubhub did not control whether anyone accompanied drivers on their deliveries. Id.

The court detailed how Lawson's individual experiences with Grubhub demonstrated Grubhub's lack of control. Although Lawson signed the initial contract in August 2015, Lawson

did not begin making deliveries for Grubhub until two months after he signed the agreement.[10] Id. at *4.  During those months, Grubhub did not contact Lawson when he did not sign up for any blocks or terminate his contract.  Id.  Lawson determined when to work for Grubhub and for how long.  Id. at *12.  Grubhub "had no control over what blocks, if any" Lawson signed up for.  Id. at * 12.  No Grubhub employee ever evaluated Lawson's performance.  Id. at *13.

When Lawson did sign up to perform deliveries, Grubhub sent him offers through the application.  Id.  Grubhub would tell Lawson where to pick up the food and where to deliver it but Grubhub did not dictate any route to use.  Id.  Grubhub also did not have rules for how quickly Lawson had to pick up or deliver the food.  Id.  Grubhub did not require that any delivery "be made in a particular amount of time."  Id.

Grubhub established a system to guarantee that drivers who accepted 75% of the delivery offers they received during their blocks earned at least a $15 per hour wage.  Id. at *5.  However, Grubhub retained so little oversight of its drivers that "[f]or weeks, if not months, Mr. Lawson was able to perform little to no deliveries and yet get compensated as if he had been available for entire blocks - and sometimes even past his scheduled blocks."  Id. at *13.  Lawson also performed deliveries for Grubhub's competitors during his tenure with Grubhub including many times during the Grubhub blocks he had signed up for.  Id. at 13.

The court found that Grubhub controlled some aspects of Lawson's work, including how much he was paid, how much customers paid for delivery services, when to schedule blocks, and geographic boundaries of delivery zones.  Id. The court also found that Grubhub's right to terminate the agreement with Lawson at will suggested an employment relationship but, as the right was mutual, Lawson did not work for Grubhub full time, and had no significant investment at risk, the right to terminate at will was neutral.  Id. at *14-15.

The court held that the right to control, which is the most important factor, weighed heavily in favor of finding that Lawson was an independent contractor.  Id. at 15.  The court distinguished the control that Grubhub retained from the control that the defendants retained in

---

[10] The court noted that this was not unusual because approximately 40% of the individuals who sign up to deliver for Grubhub never perform any deliveries.  Id.

both <u>Alexander</u>, where Federal Express controlled "drivers' appearance, route, schedule, and even what truck they could drive," and <u>Ruiz</u>, where the employer "controlled the drivers' schedules, routes, equipment, including delivery vehicles, and even 'every exquisite detail" of the drivers' appearance.'" <u>Id.</u>

The court also considered the secondary <u>Borello</u> factors. <u>Id.</u> at *15. Several of those factors suggested an employment relationship. Lawson was not engaged in a distinct occupation or business; the occupation required little skill; Grubhub paid Lawson weekly based on a combined hourly wage and per delivery rate; and Lawson's servicers were part of Grubhub's regular business. <u>Id.</u> at *15-18. Other factors weighed in favor of finding that Lawson was an independent contractor. Lawson's work was not performed under a principal's direction or supervision; Lawson provided his own tools and equipment; and the agreement reflected a "lack of permanence." <u>Id.</u> The court found that the parties' intent was neutral. <u>Id.</u> at *18. After weighing all the secondary factors, the court determined that Lawson was an independent contractor. <u>Id.</u>

### B. Discussion

The following undisputed facts point toward classifying Plaintiffs as employees. The COLAs governing Plaintiffs' relationships with Defendant allowed Defendant to terminate Plaintiffs without cause, in most cases on 15 days' notice. N. Ledesma Decl. Ex. 1 ¶ 14. The COLAs also required Plaintiffs to abide by Defendant's safety rules, which Defendant could amend unilaterally. N. Ledesma Decl. Ex. 1 ¶ 6B. Defendant's safety rules, which were set out in the Handbook,[11] had a specific section establishing rules for Draymen, which included requirements to keep the floors and dashboards of their vehicles clear and prohibitions on possessing personal bolt cutters or wearing open-toed shoes, sandals, or flip-flops. Kaufmann Decl. Ex. 4 §§ L-14, 23, 24. Plaintiffs were subject to "disciplinary action" if they violated

---

[11] Anyone on Defendant's property, whether a vendor, manufacturer, representative, visitor, or outside contractor had to follow the Handbook rules so long as they remained on the property. Kaufmann Decl. Ex. 4 at 1. Defendant argues that, since it did not apply only to employees and other workers, and it only applied to Plaintiffs when they were on Defendant's property, the Handbook is not evidence of control. Def. Opp. at 16. However, even taking the Handbook in the light most favorable to Defendant, the Handbook is evidence of control because it included a specific section with rules for Draymen and because Defendant incorporated a requirement that Plaintiffs comply with the Handbook into Plaintiffs' COLAs.

Defendant's handbook. Kaufmann Decl. Ex. 4 § L-10. Plaintiffs were also subject to an accident policy, which required them to submitting detailed accident reports, with drawings and photographs of the accident. Defendant also reviewed, in its sole discretion, whether the accidents were preventable and could disqualify drivers who were involved in a preventable accident. Kaufmann Decl. Ex. 10 at 3. Plaintiffs were also subject to Defendant's alcohol and controlled substance use policies, some of which were, by Defendant's own admission, "Company Policy, above the requirements" of federal regulations. Kaufmann Decl. Ex. 13 §§ IV.C. 4, 5. Plaintiffs were also subject to insurance and inspection requirements, although it is not clear whether any of those exceeded the requirements of applicable law. Defendant required Plaintiffs to consent to Defendant's constant monitoring of their location through the Dispatch application, which was specifically designed for Defendant. Plaintiffs received all their offers through Dispatch. Defendant chose which loads to offer to which Plaintiffs at which time. Plaintiffs never negotiated directly with customers. Defendant paid Plaintiffs on a weekly basis at rates of pay established by Defendant unilaterally.

At the same time, other undisputed facts point toward Plaintiffs being independent contractors. Plaintiffs did not have to work on days that they did not want to. Plaintiffs could reject any load that Defendant offered them, although whether Defendant retaliated against Plaintiffs for doing so is disputed. When they did accept a load, Plaintiffs could choose the route they took from pickup to delivery. Defendant did not "ride along" with Plaintiffs or otherwise evaluate Plaintiffs. Defendant did not train Plaintiffs, other than on how to use Defendant's application. Defendant did not require Plaintiff to attend meetings. Defendant did not impose any grooming or uniform requirements. Plaintiffs could hire employees and work for other companies.[12] Plaintiffs were also able to terminate the COLAs without cause upon written notice.

### 1. Right to Control

The Court must first determine what level of control was necessary for the services that Plaintiffs' performed. As set forth above, this inquiry addresses whether Defendants controlled all

---

[12] The fact that Defendant could disqualify drivers hired by Plaintiffs undercuts this fact to some extent.

the "meaningful aspects" of the business relationship and how much supervision and discipline was necessary based on the nature of the services Plaintiffs performed. See Borello, 48 Cal.3d at 356-57. The parties dispute the level of skill involved in Plaintiffs' work. Courts have held that taking packages "from point A to point B" is not skilled work and, accordingly, detailed supervision or control is unnecessary. See Air Couriers Int'l v. Employment Dev. Dep't, 150 Cal. App. 4th 923, 937 (2007). However, trucking may involve more skill than ordinary automobile driving to make small deliveries. See Gonzalez v. Workers' Comp. Appeals Bd., 46 Cal. App. 4th 1584, 1592 (1996) (stating that a "trucker who owns his truck not only needs a special class of driver's license but must learn many special driving skills (e.g., how to back up to loading dock without jackknifing the rig)); State Comp. Ins. Fund v. Brown, 32 Cal. App. 4th 188, 202–03 (1995) (stating that "truck driving-while perhaps not a skilled craft-requires abilities beyond those possessed by a general laborer").

Accordingly, drawing all inferences in favor of Defendant, the driving portion of the drayage services performed by Plaintiffs require more skill than the driving required in Alexander, Ruiz, Cotter, Lyft, and Lawson. At the same time, customer service was an important aspect of the business relationship in those cases, whereas here Plaintiffs did not interact with members of the general public. The only customer service requirements that Plaintiffs were expected to meet were to be on time to pick up their loads and drop them off and to not damage their cargo en route. Kaufmann Decl. Ex. 2, Hand Depo. at 60:18-61:8. Furthermore, Defendant did not evaluate Plaintiffs' performance, which indicates a lack of control. Defendant exercised some control over Plaintiffs' work by offering Plaintiffs specific loads to carry, with the times and locations for pickup and delivery already set. Plaintiffs were free to choose their own routes although Defendant retained the right to track Plaintiffs' location at all times.

Defendant did not control Plaintiffs' appearance as in Alexander, Ruiz, and Villalpando. However, interacting with the public was not a part of Plaintiffs' responsibilities, unlike the drivers for FedEx and furniture delivery, so controlling Plaintiffs' appearance through uniforms and grooming requirements was not necessary. Similarly, because Plaintiffs' trucks are tractors to which they attach the large cargo containers, it was not necessary to control the interior of their

trucks, as FedEx did in <u>Alexander</u>.

###### a.      **Compliance with Applicable Laws**

The parties agree that commercial trucking is a heavily-regulated field.[13]  However, the parties dispute the legal significance of the fact that Defendant required Plaintiffs to comply with various laws.  Defendant argues that its strict safety and other standards do not indicate control because applicable laws require Defendant to impose them.  Plaintiffs argue that Defendant's requirements are evidence of control especially because they exceed the legal requirements.

Plaintiffs rely on several federal cases to support their position.  <u>See</u> <u>Narayan v. EGL, Inc.</u>, 616 F.3d 895, 902 (9th Cir. 2010) (holding that a defendant-imposed requirement was evidence of control when it "was imposed to meet '*the industry standard*, the DOT regulation, *and . . . customer's requirements*'") (emphasis added); <u>Hurst v. Buczek Enterprises, LLC</u>, 870 F. Supp. 2d 810, 826 (N.D. Cal. 2012) (relying on <u>Narayan</u> and rejecting as unpersuasive the defendant's "attempt to draw a line between some hypothetical form of supervision it would implement absent client demands or legal requirements, on the one hand, and the actual form of supervision it implemented").  <u>See also</u> <u>Bowerman v. Field Asset Servs., Inc.</u>, 242 F. Supp. 3d 910, 940 (N.D. Cal. 2017) (relying on <u>Hurst</u> and <u>Narayan</u> to reject a defendant's argument that its specific requirements were not evidence of control because they were designed to ensure compliance with applicable law).  However, these federal cases pre-date the recent California Court of Appeals decision, <u>Linton v. Desoto Cab Co., Inc.</u>, which held that, a "putative employer does not exercise any degree of control merely by imposing requirements mandated by government regulation."  15 Cal. App. 5th 1208, 1223 (2017), <u>reh'g denied</u> (Nov. 2, 2017), <u>review denied</u> (Jan. 10, 2018) (ultimately remanding because the trial court had failed to consider secondary <u>Borello</u> factors in its

---

[13] For example, federal regulations require that the trucks bear the legal name or a single trade name of the carrier.  49 C.F.R. § 376.11499(c)(1); C.F.R. § 390.21T.  They also require that the "authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1).   At least one California court has held that the inclusion of these required terms in lease agreements does "not transform an agreed upon independent contractor relationship between the carrier and truck owner/operator into an employee relationship under" California law.  <u>Amerigas Propane, LP v. Landstar Ranger, Inc.</u>, 184 Cal. App. 4th 981, 999 (2010).

post-trial ruling that the plaintiff was not an employee).[14]  The court in <u>Linton</u> also held that "[a]dditional restrictions or modifications made to government regulations can be another indicia of employer control."  <u>Id.</u> at 1224.  Based on <u>Linton</u>, restrictions or standards that Defendant imposed based solely on applicable law are not evidence of control, but further requirements that Defendant imposed on Plaintiffs to supplement applicable regulations and laws do evince control.

Defendant states that its Accident Policy is necessary because federal regulations require Defendant to have "adequate safety management controls in place . . . to reduce the risk associated with" the following:

> (a) Commercial driver's license standard violations (part 383 of this chapter),
> (b) Inadequate levels of financial responsibility (part 387 of this chapter),
> (c) The use of unqualified drivers (part 391 of this chapter)[15],
> (d) Improper use and driving of motor vehicles (part 392 of this chapter),
> (e) Unsafe vehicles operating on the highways (part 393 of this chapter),
> (f) Failure to maintain accident registers and copies of accident reports (part 390 of this chapter),
> (g) The use of fatigued drivers (part 395 of this chapter),
> (h) Inadequate inspection, repair, and maintenance of vehicles (part 396 of this chapter),
> (i) Transportation of hazardous materials, driving and parking rule violations (part 397 of this chapter),
> (j) Violation of hazardous materials regulations (parts 170–177 of this title), and
> (k) Motor vehicle accidents and hazardous materials incidents.

49 C.F.R. § 385.5.  Plaintiffs point out, however, that Defendant's accident reporting policies exceed those required by government regulations because they apply to all accidents, even minor ones, while the federal regulations apply only to accidents involving fatalities, bodily injury requiring medical treatment away from the scene of an accident, or disabling damage to a motor vehicle requiring the vehicle to be transported away from the scene by another vehicle.  <u>Compare</u> 49 C.F.R. § 390.5(1) <u>with</u> Kaufmann Decl. Ex. 10.  Defendant's rules also allow Defendant to terminate Plaintiffs if an accident was preventable, which does not appear in the regulations.

Defendant also argues that its Alcohol Use and Testing Policy is necessary because federal

---

[14] In <u>Narayan</u>, on which both cases rely, the requirement was imposed for several reasons, not just to comply with regulations.
[15] Being at fault in a preventable accident, alone, is not grounds for disqualification under 49 C.F.R. § 391.15.

regulations require Defendant to provide drivers with educational materials that explain the federal requirements and the employer's policies and procedures.  See 49 C.F.R. § 382.601(a).  The regulation that Defendant cites provides employers with the option to:

> include information on additional employer policies with respect to the use of alcohol or controlled substances, including any consequences for a driver found to have a specified alcohol of controlled substances level, that are based on the employer's authority independent of this part.  Any such additional policies or consequences must be clearly and obviously described as being based on independent authority.

49 C.F.R. § 382.601(c).  Defendant's policies for Post Accident Testing and Return to Work Criteria state that they exceed federal regulations.  Kaufmann Decl. Ex. 13 §§ IV.C. 4, 5. Moreover, Defendant also has a policy that no driver shall report for duty while having an alcohol concentration of any measurement,  Kaufmann Decl. Ex. 10 at CSXIT00851, whereas the regulations prohibit drivers from reporting to duty or remaining on duty while having an alcohol concentration of 0.04 or greater.  49 C.F.R. § 382.201.

Defendant states that its Roadside Inspection, Overweight Prevention, and Citations and Fines policies "merely clarify what inspections are required under federal regulations."  Opp. at 17 (citing 49 C.F.R. §§ 392.7, 396.3).  Plaintiffs note that Defendant's Roadside Inspection Policy establishes progressive discipline for violations during roadside inspections, including warning letters, and being placed on a six month "Safety Hold," and cancellation of the COLA for and bonuses for inspections with no violations.  Kaufmann Decl. Ex. 12 at CSXIT 00842-43.  The regulations that Defendant cites do not require that discipline, but do require that the driver correct any deficiencies within 15 days and before operating the vehicle again.  See 49 C.F.R. § 396.9(d)(2)-(3); 49 C.F.R. § 396.11(a)(3).  Thus, Defendant's policies exceed those legally required.

A reasonable jury could infer from these strict requirements that Defendant retained significant control over the manner in which Plaintiffs drove and maintained their trucks by subjecting Plaintiffs to discipline for causing preventable accidents or having safety violations and requiring them to have no measurable alcohol concentration while on duty.  However, a reasonable jury could also infer that Defendant's policies, even the ones that exceed the exact

36

requirements set out in the regulations, do not evince significant control because they are designed to implement the regulations' more general direction that motor carriers have "adequate safety management controls" in place in order to make sure that their drivers are meeting the regulations. See 49 C.F.R. § 385.5.

### b. Schedules

Defendant argues that Plaintiffs' abilities to set their own schedules weigh against finding that they are employees. Defendant relies on Hennighan v. Insphere Ins. Sols., Inc., in which the district court determined that the plaintiff, an insurance salesman, was an independent contractor as a matter of law because any control that the defendant insurance company exercised over him was directed toward the results and unrelated to the manner and means by which he accomplished his work. 38 F. Supp. 3d 1083, 1107 (N.D. Cal. 2014), aff'd, 650 F. App'x 500 (9th Cir. 2016). There, the plaintiff established his own schedule and decided which policies he wanted to sell. Id. at 1100. The defendant did not monitor or supervise his work, did not evaluate his work, and did not control the ways he interacted with clients or how he sought sales leads. Id. Similarly, in Beaumont-Jacques v. Farmer Group, Inc., the court held that the plaintiff had exercised meaningful discretion by:

> for instance, recruiting agents for and, when selected, training and motivating those agents to sell the Signatory Defendants' products; determining her own day-to-day hours, including her vacations; on most days, fixing the time for her arrival and departure at her office and elsewhere, including lunch and breaks; preparing reports for and attending meetings of the Signatory Defendants; hiring and supervising her staff, i.e., those who worked at her office, while remitting payroll taxes for them as employees; performing other administrative tasks, including resolving problems; paying for her costs such as marketing, office lease, telephone service and office supplies.

217 Cal. App. 4th 1138, 1144–45 (2013). The court held that the plaintiff was an independent contractor as a matter of law. Id. at 1147.

Hennigan and Beaumont-Jacques differ from the situation here insofar as the workers truly set their own schedule. They had the freedom not only to *not* work on certain days or at certain times, but also the freedom *to* work at times of their choosing. By contrast, Plaintiffs controlled their schedules only by deciding whether or not to accept loads when Defendant offered them.

Although dispatchers attempted to accommodate Plaintiffs' preferences, that is evidence of Defendant's exercise of its right to control. Moreover, unlike in <u>Lawson</u>, where the plaintiff could go months without working for the defendant or contacting the defendant at all, Defendant could expect Plaintiffs to be available to work unless it heard otherwise. [16] Plaintiffs stated in their declarations that they had to notify Defendant if they wanted to take a day off. Defendant agrees that Plaintiffs notified Defendant before taking time off. Opp. at 8 (citing Hand Opp. Decl. Ex. 8). Accordingly, Defendant retained a greater right to control Plaintiff's schedule than the defendants in <u>Hennigan</u>, <u>Beaumont-Jacques</u>, and <u>Lawson</u> did.

### c. Conclusion

While Plaintiffs make a strong case that Defendant retained all necessary control over their work and might well prevail on this issue at trial, drawing all inferences in Defendant's favor, the evidence is not so strong that a reasonable jury could not determine that Defendant did not do so. For example, the jury could give significant weight to the facts that Plaintiffs chose their own routes, could reject specific offers, and did not have their performance evaluated. Because the right to control is the most important part of the multi-factor test, the fact that it does not necessarily point in one direction is a strong indication that summary judgment is not warranted.

### 2. Secondary Factors

Similarly, the secondary factors are mixed and do not so clearly favor a finding that Plaintiffs are employees that no reasonable jury could disagree. Several factors support a finding that Plaintiffs are employees. Plaintiffs' work was integral to Defendant's business. The relationships were fairly permanent, with each lasting at least over a year. Defendant provided some of the instrumentalities of the work, although it required Plaintiffs to pay for them. Defendant supplied the location of the work, dictating to Plaintiffs where they should pick up loads and where they should deliver them. Defendant had a broad right to terminate Plaintiffs. [17]

---

[16] Similarly, in <u>O'Connor</u>, drivers could work as little as they wanted, so long as they gave at least one ride every 180 days or every 30 days, depending on the platform that they worked for. 82 F. Supp. 3d at 1148-49.

[17] Some courts have found that the right to terminate workers at will is neutral when the right is mutual. <u>See</u>, <u>e.g.</u>, <u>Lawson</u> 2018 WL 776354, at *14-15.

38

Yet several factors favor a finding that Plaintiffs are independent contractors.  The strongest of these is that Plaintiffs must make a substantial investment in their trucks.  The next strongest, especially when taken in the light most favorable to Defendant, is that Plaintiffs have an opportunity for profit or loss depending on their managerial skill.  Further, Plaintiffs are engaged in a distinct occupation or business.  Other factors weigh slightly in favor of an independent contractor status.  For example, Plaintiffs must have some specialized training, although the overall skill level of the work is not high.  Defendant paid Plaintiffs by the job rather than the hour.  However, since it is undisputed that Defendant paid Plaintiffs every week, which is more like an employment relationship, this factor does not weigh strongly in favor of Defendant.

Finally, Plaintiffs entered into COLAs that stated that they were independent contractors and several Plaintiffs and other Drivers testified that they subjectively intended to form an independent contractor relationship.  However, neither a contract label nor the parties' subjective beliefs are dispositive when the parties' conduct establishes a different relationship.  See Ruiz, 754 F.3d at 1105; Alexander, 765 F.3d at 997.

### C.    Conclusion

Because some of the secondary factors weigh in favor of finding an independent contractor status, and the right to control, which is the most important factor, could support a finding of either status, a reasonable jury could that Plaintiffs are independent contractors.  Accordingly, while Plaintiffs make a strong argument, the Court cannot determine that Plaintiffs are employees as a matter of law. Therefore, the Court **DENIES** Plaintiffs' motion for summary judgment on employment status.

## V.    DEFENDANT'S RULE 56(D) REQUEST

Defendant sought relief  under Rule 56(D), which provides:

If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
(1) defer considering the motion or deny it;
(2) allow time to obtain affidavits or declarations or to take discovery; or
(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).  Because the Court is denying Plaintiffs' motion for summary judgment, the

1  Court **DENIES** Defendant's request as moot.

2  ## VI.    PLAINTIFFS' EVIDENTIARY OBJECTIONS

3          Plaintiffs object to the Declaration of Paul Hand, Defendant's corporate designee, filed in

4  support of Defendant's Opposition, on the ground that Hand lacks personal knowledge of the

5  matters in his declaration.  See Fed. R. Evid. 602; Pltf. Rep. at 3-4, notes 4-6.  In the declaration,

6  Hand states that he has personal knowledge of the matters he describes and explains why.  Hand

7  Decl. ¶¶ 1-5.  Plaintiff argues an earlier deposition by Hand shows that he does not have personal

8  knowledge of those matters.  See Kaufmann Decl. Ex. C.  That deposition shows that Hand did not

9  personally supervise Defendant's operations in California, but does not establish that Hand did not

10  have knowledge of the practices in California from ten years of working for Defendant.  The Court

11  **OVERRULES** Plaintiffs' objections to this declaration.

12  ## VII.    ADMINISTRATIVE MOTION TO FILE EXHIBITS UNDER SEAL

13          Plaintiffs initially moved to file six exhibits to the Declaration of Aaron Kaufmann under

14  seal, on the grounds that Defendant had designated them confidential.  On February 5, 2018,

15  Defendant filed a declaration withdrawing their confidentiality designation for one of the exhibits

16  but retaining the confidentiality declaration for the other five.  On February 6, 2018, Defendant

17  filed an amended declaration withdrawing their confidentiality designation for all six exhibits.

18  Accordingly, the Court **DENIES** Plaintiffs' administrative motion to file those exhibits under seal.

19  ## VIII.    CONCLUSION

20          For the reasons stated above, the Court **DENIES** Defendant's motion to strike, **DENIES**

21  Plaintiffs' motion for partial summary judgment, **DENIES** Defendant's request to defer Plaintiffs'

22  motion until more discovery takes place, **OVERRULES** Plaintiffs' objections to Hand's

23  declaration, and **DENIES** Plaintiffs' administrative motion to file exhibits under seal.

24          **IT IS SO ORDERED.**

25  Dated: March 27, 2018

26

27

28                                              ELIZABETH D. LAPORTE
                                                United States Magistrate Judge

                                        40